REHEARING EN BANC GRANTED BY ORDER FILED 10/10/96;
PUBLISHED OPINION ISSUED 8/23/96 IS VACATED

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 95-5238

ANTHONY D. BARBER,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 95-5250

DAVID L. HODGE, JR.,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Eastern District of North Carolina, at Fayetteville.
Malcolm J. Howard, District Judge.
(CR-94-36)

Argued: May 10, 1996

Decided: August 23, 1996

Before WIDENER and MURNAGHAN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Vacated and remanded by published opinion. Senior Judge Phillips
wrote the opinion, in which Judge Widener and Judge Murnaghan
joined.

_____

**COUNSEL**

**ARGUED:** George Alan DuBois, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellants. John Samuel Bowler, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** William Lee Davis, III, Lumberton, North Carolina, for Appellant Hodge. Janice McKenzie Cole, United States Attorney, Paul S. Wilson, Special Assistant United States Attorney, OFFICE OF THE STAFF JUDGE ADVOCATE, Fort Bragg, North Carolina, for Appellee.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Appellants Anthony Barber and David Hodge stand convicted of second-degree murder on the basis of pleas of guilty in the district court. As part of their plea agreements, the government agreed to dismiss additional charges of robbery and felony murder on which both men had been indicted. The district court accepted each defendant's plea agreement but, at sentencing, departed upward from the otherwise applicable Guidelines range. Barber and Hodge appeal their respective sentences on the grounds that the district court's justifications for departure were invalid in several different ways. Finding merit in some but not all of Barber's and Hodge's contentions, we vacate both sentences and remand for resentencing.

I.

Barber was a college student in Fayetteville, North Carolina with no prior criminal record when he began working as a driver for a drug dealer named Terrell Fields in early 1994. Apparently, Fields failed to pay Barber for his services and on several occasions threatened Barber and his family. But, whatever Barber's grievances with Fields may have been, Barber eventually admitted in a post-plea statement that he and Hodge had planned to murder Fields on the evening of April 14. To that end, Barber had bought a shotgun and picked up Hodge on the appointed date just before he was to take Fields to buy

2

drugs. Hodge had then loaded the gun and hidden it under the front seat of Barber's car. Barber paged Fields, who met them at a gas station. The three of them left the gas station with Barber driving, Fields in the passenger seat, and Hodge in the back seat. Not long into the trip, Hodge took out the gun and shot Fields in the back of the head. At some point, either Hodge or Barber shot Fields again in the back of the head. They disposed of the body on Fort Bragg, where Barber also went through Fields's pockets and found about $50 that he and Hodge split.

Within a few days Barber and Hodge were arrested for the murder of Fields. Hodge promptly provided the government with a written statement in which he admitted to shooting Fields but claimed that the shooting was an accident. He also claimed that, after he had accidentally fired the first shot, Barber pulled over, saw that Fields was shaking, took the gun, and fired a second shot into the back of Fields's head. Finally, Hodge said that Barber searched Fields and found the money that he and Barber split.

Since the crime was committed at least in part on federal territory (Fort Bragg), Barber and Hodge were taken into federal custody. The government charged both men with conspiracy to commit murder, 18 U.S.C. § 1117, felony murder, 18 U.S.C. §§ 1111 & 2, use of a firearm in connection with each of those crimes, 18 U.S.C. § 924(c)(1), and robbery, 18 U.S.C. § 2111. However, apparently accepting that its evidence of the robbery at that point was weak, the government agreed to dismiss the robbery, felony murder, and other charges in return for each defendant's agreement to plead guilty to second-degree murder. The plea agreement contained no promises regarding either defendant's ultimate sentence.

Having agreed to plead guilty, Barber then provided the government with the statement in which he admitted to planning the murder with Hodge and to robbing Fields. All agree that that self-incriminating statement was not available for the district court to use in sentencing Barber, see U.S.S.G. § 1B1.8, but was available to be used against Hodge.

At sentencing, the district court accepted the initial calculations that placed each defendant's offense level at 30 and guideline range

3

at 97-121 months but then departed upward by seven offense levels to 37 and a range of 210-262 months. The grounds for the departure in Hodge's case were premeditation, the use of a dangerous instrumentality in the crime (the gun), and the robbery. In Barber's case, the grounds were the same except for premeditation, which the court could not find with regard to Barber, since the only evidence of premeditation was in the protected statement that Barber had made after the conclusion of his plea agreement. In each case, the court ultimately imposed a sentence of 210 months.

These appeals followed.

II.

The appellants challenge the district court's departures in their respective cases on several grounds. Each claims that the dangerous-instrumentality grounds were unavailable to the district court because the use of a gun to commit second-degree murder is a circumstance that was considered by the Sentencing Commission in establishing the offense levels for murder. Hodge claims that the premeditation ground was unavailable as to him for similar reasons. Each also claims that the robbery was not available to the district court as grounds for departure because the Guidelines do not permit departures on the basis of conduct underlying counts that have been dismissed as part of a plea agreement. Finally, Barber claims that the only reliable evidence against him regarding the robbery is contained in his protected, § 1B1.8 statement and so could not be used against him. We preface our discussion of these several claims with a summary of the general principles of departure that govern most of the issues they raise.

A.

A sentencing court may not depart from an otherwise applicable guideline range simply because its own sense of justice would call for it. See <u>Koon v. United States</u>, 64 U.S.L.W. 4512, 4517 (U.S., June 13, 1996) ("Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline."). It may depart only when it has specifically found "that there exists an aggravating or mitigating circumstance of

4

a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . ," 18 U.S.C. § 3553(b), or when the Guidelines otherwise specifically provide for it, see, e.g., 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 (authorizing downward departures for substantial assistance to the government). As many cases have recognized and as the Guidelines specifically state, each guideline "carv[es] out a `heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, . . . where conduct significantly differs from the norm, the court may consider whether a departure is warranted." United States Sentencing Commission, Guidelines Manual, 5-6 (1995); see also, e.g., Koon, 64 U.S.L.W. at 4515; United States v. Rivera, 994 F.2d 942, 947-49 (1st Cir. 1993). The Commission intends departures to be rare, as rare as the Commission's own example of a fraud that involves physical injury. Guidelines Manual at 6. Where a circumstance has been adequately taken into account by the Commission in setting a guideline range, as most relevant circumstances have been, that circumstance cannot be used to justify a departure. Koon, 64 U.S.L.W. at 4515-16.

In determining whether particular conduct found at sentencing has been adequately considered by the Commission, a district court must carefully consider the nature of the offense(s) of which the defendant has actually been convicted. And it must do so only by considering how those offenses are treated in the guidelines, policy statements, and official commentary of the Commission. 18 U.S.C§ 3553(b). If the conduct at issue is typical of the offense of conviction or of the specific offense characteristics in the applicable guideline, in kind and degree, then, of course, there is no basis for concluding that the Commission failed adequately to consider that conduct. See, e.g., Koon, 64 U.S.L.W. at 4515 (where "the case is an ordinary one" the Commission has by definition adequately considered the circumstances and the district judge "must impose . . . a sentence falling within the range of the applicable Guideline . . ."); United States v. Harrison, 37 F.3d 133, 138 (4th Cir. 1994) (holding "that the Commission did adequately consider the fact that a defendant may transfer a weapon with knowledge that it will be used to commit a drug-trafficking offense" and invalidating the district judge's departure on those grounds). Similarly, if the conduct is culpable on its own account but nevertheless legally irrelevant to the particular offense of which the defendant has

5

actually been convicted, then, again, there is no basis for concluding that the Commission failed adequately to consider that conduct in setting offense levels. See United States v. Kelly , 1 F.3d 1137, 1139-41 (10th Cir. 1993) (finding premeditation implicitly considered by the Commission when left absent from the guideline for second-degree murder); United States v. Kim, 896 F.2d 678, 686 (2d Cir. 1990) (finding that "counterfeit money misconduct" would normally be insufficiently related to alien-smuggling convictions to justify departure but that in the particular circumstances the connection was sufficient). In sum, where the conduct in question is either typical of the offense of conviction or irrelevant to that offense, the district court must accept that the Commission has implicitly taken that conduct into account--insofar as Guidelines philosophy permits it to be taken into account at all--and thus eliminated such conduct as grounds for departure.

We review decisions to depart for abuse of discretion because of their essentially "factual nature." Koon , 64 U.S.L.W. at 4517. But we keep in mind that a district court's legal conclusions in interpreting the Guidelines, made in the course of exercising its discretion, require no deference from us. As the Supreme Court recently has held, "[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions," and "the court of appeals need not defer to the district court's resolution" of such questions of law. Koon, 64 U.S.L.W. at 4517. In the context of departure, questions of law will normally arise as questions whether a particular ground of departure is ever appropriate. Koon, 64 U.S.L.W. at 4517. Here the appellants' challenges to the district court's decision to depart are of exactly such a kind: whether a finding of discharge of a firearm without more or a finding of premeditation can ever sustain a departure on a conviction for second-degree murder; and whether a district court's departure decision can ever rely on conduct underlying counts dismissed by plea bargain. Formally, therefore, we review the district court's decision for abuse of discretion, but, given the particular nature of the questions on this appeal, we are required to accord that decision little or no deference.

B.

The district court's upward departure in imposing both sentences was based in part on the grounds that a firearm was used. It observed

6

that, "Section 2A1.2 [the guideline for second-degree murder] has no provision for addressing the use of the firearm during the commission of a murder, but Section 5K2.6 provides that if a weapon was used in the commission of the offense, the Court may increase above the authorized Guideline range." JA 80 (sentencing transcript).

We conclude, contrary to the district court, that the Commission could not have failed to take into account in setting the offense level for murder that that offense is commonly committed by use of a gun and almost universally by the use of some weapon or "dangerous instrumentality." No scenario could be more typical, more within the heartland, of second-degree murder than death by one weapon or another, especially by firearm. It would be out of keeping with the philosophy of the Guidelines to hold that sentencing courts are free to depart on this basis in almost every case of second-degree murder. To approve a § 5K2.6 departure in this type of case would be to exempt murder sentences generally from the close discipline that the Guidelines mean to impose on courts in all but unusual cases. And it would undermine the Commission's efforts to obey its mandate from Congress to pursue uniformity in sentencing from one courtroom to the next. Consequently, we conclude that, in the absence of a showing that the particular use of a weapon or dangerous instrumentality somehow aggravated the murder "to a degree substantially in excess of that which is ordinarily involved in the offense," see § 5K2.0 (discussing grounds for departure generally), a district court may not rely on the discharge of a firearm to sustain a departure above the otherwise applicable offense level for second-degree murder. In reaching this conclusion, we join the only other circuit we know to have ruled on this particular question. See United States v. Kelly, 1 F.3d 1137, 1141-42 (10th Cir. 1993).

The district court's incorrect application of the Guidelines on this score is sufficient to require that we vacate the sentences of both Barber and Hodge and remand for resentencing. See Williams v. United States, 503 U.S. 193, 200-03 (1992) ("[A] sentencing court's use of an invalid departure ground is an incorrect application of the Guidelines" within the meaning of 18 U.S.C. § 3742(f)(1) and (absent harmless error) requires vacation of the sentence and remand for resentencing). Because the appellants have raised other substantial

7

issues respecting the validity of the challenged departures that may again surface on resentencing, we will address them as well.

C.

The district court also based its upward departure in Hodge's case on a finding of premeditation. This basis could not apply to Barber because, as the district court recognized, the only evidence of premeditation that was available at sentencing was Barber's post-plea statement. That statement could be used against Hodge but, under the terms of § 1B1.8,**1** not against Barber. Hodge now challenges the departure on the grounds that the Commission adequately considered the circumstance of premeditation in formulating the guideline for second-degree murder.**2** We agree with Hodge's contention.

_____

**1** Section 1B1.8(a) provides:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

**2** Hodge did not specifically challenge the use of premeditation in his opening brief, presumably because he read the sentencing decision as relying only on the discharge of the firearm and on the robbery and not on premeditation, which, comparatively, got only a passing reference from the court in the sentencing hearing. However, in its answering brief, the government urged that the departures be upheld on the basis, in part, of the district judge's reliance on a finding of premeditation with respect to each of the defendants. Apparently, the government also misunderstood the district court's conclusions since the premeditation finding was made only with respect to Hodge. However that may be, the fact that the government raised the issue and briefed it on its merits invited the appellants' responsive challenge to the government's justification of the premeditation grounds. For that reason, we may properly consider the issue. Cf. Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1542 (11th Cir. 1994) ("[B]riefs should be read liberally to ascertain the issues raised on appeal" and the waiver rule should not be applied when "unduly harsh").

8

Hodge relies again on <u>United States v. Kelly</u>, 1 F.3d 1137 (10th Cir. 1993), which is squarely on point. There, the court first noted the language in 18 U.S.C. § 3553(b) that limits a court's power to depart to only those situations where the sentencing court finds a relevant circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . . ." Proceeding to consider whether the Commission had thus taken premeditation into account, the court observed that the Commission had established base offense levels of 33 for second-degree murder, see § 2A1.2, and 43 for first-degree murder, see § 2A1.1, and that it had referred the reader to the federal murder statute, 18 U.S.C. § 1111(a), for definitions of those crimes. Turning to that statute, the court then concluded that, "Premeditation is the only element which distinguishes first degree murder from second." <u>Kelly</u>, 1 F.3d at 1140. The implication was clear:

> Premeditation was obviously considered in assigning the sentencing ranges applicable to first and second degree murder, as it is the only distinguishing factor between the two crimes, and thus accounts for a ten base offense level disparity. Consequently, the defendant's state of mind was adequately considered by the guidelines when assigning offense levels to the different statutory degrees of homicide. Moreover, premeditation is not a factor which the defendant could possess "of a kind" or "to a degree" not adequately considered by the guidelines, but instead is an all-or-nothing determination.

<u>Kelly</u>, 1 F.3d at 1141 (citation omitted). Since premeditation was considered by the Commission and given a precise sentencing effect when properly found, it was not available as a ground for departure in respect of a second-degree murder conviction.

We agree with the holding in <u>Kelly</u>, although with one modification. <u>Kelly</u> says that the only difference between the two degrees of murder is premeditation, but of course first-degree murder also includes felony murder, which does not require premeditation as such. See 18 U.S.C. § 1111(a). We do not, however, think that this observation affects <u>Kelly</u>'s basic conclusion that the Commission obviously considered the defining differences between second- and first-degree

9

murder--either premeditation or coincident perpetration of a felony--in assigning substantially different base offense levels to different degrees of murder.

Beyond this, we find further support for the holding in Kelly in the apparent rationale for the Commission's choice not to make premeditation a specific offense characteristic for second-degree murder. The federal murder statute here at issue defines first-degree murder essentially as premeditated murder (or felony murder) and then defines second-degree murder as "[a]ny other murder." 18 U.S.C. § 1111(a). By definition, then, second-degree murder is murder without premeditation. As indicated earlier, facts relied on at sentencing to increase or depart from an offense level must be relevant to the count of conviction; they must be aggravators or mitigators of the particular offense of which this defendant has actually been convicted, not just accumulations of bad things this defendant may have done independent of the count of conviction. The Commission explicitly rejected pure, real-offense sentencing with its virtually limitless factfinding and instead provided for a system that relies on factfinding that is limited to conduct relevant to the offense of conviction. See United States v. Kim, 896 F.2d 678, 682-84 (2d Cir. 1990) (comprehensively discussing the Guidelines' treatment of conduct not resulting in conviction and concluding that such conduct is only available insofar as it is relevant to the offense of conviction (or meets the separate criteria for a criminal-history departure)); see also, e.g., United States v. Isom, 886 F.2d 736, 739 (4th Cir. 1989) (holding that conduct underlying an acquitted charge can be used at sentencing insofar as it is used to enhance punishment for the count of conviction rather than to add on an independent punishment for the acquitted charge). Given the statutory definition of second-degree murder as murder without premeditation, the Commission appears to have come to the sensible, perhaps inescapable, conclusion that premeditation should not be used as an aggravator of a crime that by definition lacks premeditation. To do otherwise would be to use sentencing mechanisms to punish defendants for crimes of which they have not been convicted.

We agree with Kelly that the Commission evidenced its full consideration of the circumstance of premeditation when it assigned a higher base offense level to first-degree murder than to second-degree mur-

10

der. And we hold, consequently, that premeditation is an invalid ground for departure on a second-degree murder conviction.

D.

The district court's next ground for departure was the robbery that had underlain the felony-murder and substantive robbery charges that were dismissed by way of the plea agreements. Barber and Hodge objected to the court's use of the robbery on the grounds that conduct underlying counts that have been dismissed pursuant to a plea agreement cannot support a <u>departure</u> even though such conduct is freely available to support a sentence <u>enhancement</u> that rests on the specific offense characteristics detailed in the applicable guideline. Their complex argument claims, in effect, that use of dismissed-count conduct for departure would constitute punishment for conduct that had been bargained out of the case and thus would be profoundly destructive of the plea-bargaining system on which the federal courts allegedly depend. Consequently, although the Commission has not adopted this reasoning explicitly, they claim that certain ambiguous formulations in the Guidelines must be taken to have adopted it implicitly. This argument might be very well taken if actually directed to the Sentencing Commission, and it has been adopted by some circuits,[3] but it has not been explicitly adopted by the Commission. And we do not find it so compelling as to drive us to the conclusion that the Sentencing Commission has embodied that policy in the Guidelines by implication.

1.

The appellants' first approach to their argument is to suggest that the general structure of the Guidelines is hostile to the use of dismissed-count conduct for departure. However, as a matter of fact, the Guidelines generally encourage courts to range widely and without inhibition in their factfinding at sentencing. The relevant conduct guideline, § 1B1.3, expresses the Commission's general determination that anything and everything that helps to illuminate the seriousness of the offense be available for consideration by the sentencing

_____

[3] See <u>United States v. Faulkner</u>, 952 F.2d 1066, 1069-70 (9th Cir. 1991); <u>United States v. Thomas</u>, 961 F.2d 1110, 1120-22 (3d Cir. 1992).

court. Section 1B1.3 is the foundational guideline for determination of an offender's guideline range, and, as such, underlies the multitude of specific offense characteristics that are given sentencing weight in the various offense-specific guidelines.[4] Thus it comprehensively requires a court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," § 1B1.3(a)(1)(A); in the case of a crime committed with others, it further requires the court to hold the defendant responsible for all such conduct by the defendant's associates as well, as long as that conduct was reasonably foreseeable to the defendant, § 1B1.3(a)(1)(B); and, for many crimes, it further requires that the court consider all such conduct done in connection with any larger course of criminal conduct of which the offense of conviction was a part, § 1B1.3(a)(2). This rather sweeping command to consider a wide range of facts as long as they are relevant to the offense of conviction is taken even further by guideline § 1B1.4. Section 1B1.4 moves even beyond § 1B1.3's commands regarding determination of the initial guideline range to authorize a court, when picking a sentence within the determined range or considering whether to depart from that range, to "consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."

Of course, that last phrase--"unless otherwise prohibited by law" --is crucially important. It means that, although the court has great freedom to consider a wide range of facts, at least two categories of information are excluded. The first category, as shown above, is information that proves to be irrelevant to sentencing this offender for this crime; in other words, the court's broad authority to consider any information does not authorize the court to punish the offender independently for conduct of which she or he has not been convicted but only to use information relevant to the offense of conviction to enhance the sentence for that count. See United States v. Kim, 896 F.2d 678, 682-84 (2d Cir. 1990). The second category includes any

---

[4] It also underlies the factors that are to be taken into account in evaluation of an offender's criminal history. See U.S.S.G.§ 1B1.3(b).

12

information that is subject to some other independent exclusion. This category includes positive exclusions not only of such irrelevancies as, for example, the offender's gender (positively excluded by § 5H1.10) but also, for example, the highly relevant contents of statements made by cooperating offenders pursuant to plea agreements. See U.S.S.G. § 1B1.8. Such positive exclusions will sometimes remove information from the sentencer's consideration not because the information is irrelevant, not so the offender will thereby receive a more just sentence for her or his conduct, but simply because the loss of relevant information is the price the system must pay to achieve the greater good of bringing more offenders to justice.

Under these principles, we see nothing inherent in the philosophy of the Guidelines that would prevent a sentencing court's upward departure from an otherwise applicable offense level on the basis of proven conduct that underlay a dismissed count, just so long as that conduct is, in fact, relevant and is not otherwise positively excluded. The Second and Tenth Circuits have so held. See Kim, 896 F.2d at 685; United States v. Zamarripa, 905 F.2d 337, 341 (10th Cir. 1990); cf. United States v. Ashburn, 38 F.3d 803, 807-08 (5th Cir. 1994) (approving use of such conduct to sustain a criminal-history departure).

2.

Barber and Hodge argue, however, that either Guidelines Policy Statement 6B1.2(a)[5] or Rule 11(e) of the Federal Rules of Criminal

_____

[5] Section 6B1.2(a) of the Guidelines is a "policy statement" and thus carries somewhat less authority than does an actual"guideline." Compare 18 U.S.C. 3553(b) (explicitly making guidelines binding on the courts but requiring only consideration of policy statements) with Stinson v. United States, 508 U.S. 36, 42 (1993), and Williams v. United States, 503 U.S. 193, 201 (1992) (finding policy statements binding insofar as they interpret guidelines and do not violate other positive law). Here, we assume for argument's sake that § 6B1.2(a) is binding, notwithstanding the fact that its chapter in the Guidelines consists of nothing but policy statements, see United States v. Davis, 53 F.3d 638, 640 n.6 (4th Cir. 1995) (finding a Chapter 7 policy statement non-binding because there are no actual guidelines in Chapter 7 for it to interpret), since it arguably interprets at least §§ 1B1.3 and 1B1.4 and because courts have generally treated it as authoritative. Also, neither party has argued that § 6B1.2(a) may lack authority because of its status as a policy statement.

13

Procedure, or a combination of the two does indeed constitute a positive exclusion of dismissed-count conduct from consideration for departure. In support, they cite cases from several circuits that either have so held or so suggested in dictum. See United States v. Castro-Cervantes, 927 F.2d 1079, 1082 (9th Cir. 1991); United States v. Faulkner, 952 F.2d 1066, 1069-70 (9th Cir. 1991); United States v. Fine, 975 F.2d 596, 602 (9th Cir. 1992) (en banc); United States v. Thomas, 961 F.2d 1110, 1120-22 (3d Cir. 1992); United States v. Harris, 70 F.3d 1001, 1003-04 (8th Cir. 1995); United States v. Ruffin, 997 F.2d 343, 345-46 (7th Cir. 1993) (dictum); United States v. Citro, 938 F.2d 1431, 1444-45 (1st Cir. 1991) (dictum).

Neither the appellants here nor any of the cases they rely upon point to any language in § 6B1.2(a) or Rule 11(e) that explicitly limits the use of dismissed-count conduct as the basis for departures. The argument is rather that (1) the Guidelines' theory of departure and (2) the imperatives of the plea-bargaining system together require that the ambiguous language of § 6B1.2(a) and Rule 11(e) be interpreted to limit the use of dismissed-count conduct. In particular, the appellants contend (1) that to permit courts to take dismissed-count conduct into account in choosing to depart allows them, in effect, to punish offenders for more conduct than can be deemed relevant to their actual convictions and thus (2) defeats the reasonable sentencing expectations that the parties embodied in the plea agreement's dismissal of counts.

The starting point for evaluating this argument is, of course, the legal texts. Once a court has decided to accept a plea agreement, Rule 11(e)(3) requires that it "embody in the judgment and sentence the disposition provided for in the plea agreement." And § 6B1.2(a) says that,

> In the case of a plea agreement that includes the dismissal of any charges . . . , the court may accept the agreement if the court determines . . . that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.

The appellants and their supporting cases again read in these provisions a ban on using dismissed-count conduct to depart upward for

14

two, connected reasons. First, they argue that a court's departure upward on such facts constitutes a determination that the pled counts did <u>not</u> "adequately reflect the seriousness of the actual offense behavior" even though acceptance of the plea agreement under the authority of § 6B1.2(a) signified the court's prior determination that they did. See <u>Castro-Cervantes</u>, 927 F.2d at 1082; <u>Harris</u>, 70 F.3d at 1004; <u>Citro</u>, 938 F.2d at 1444-45. Second, they suggest that to depart upward in that way is similarly to refuse to "embody in the judgment and sentence the disposition provided for in the plea agreement" as required by Rule 11(e)(3). Cf. <u>Harris</u>, 70 F.3d at 1004 (emphasizing the court's power under Rule 11 to reject the plea agreement rather than thwart the parties' expectations as to the ultimate disposition of the case).

The gist of these arguments is that, even though neither the plea agreements nor any of these passages of legal text addresses dismissed-count-conduct departures directly, the function of departures in the Guidelines system compels such an interpretation. While the Guidelines expressly authorize the use of dismissed-count conduct for enhancement under § 1B1.3, see § 6B1.2(a), the appellants insist that departures are different. They seem to argue that, unlike § 1B1.3 enhancements, departures do not constitute additional punishment for the pled count(s)--additional punishment that the parties to a plea agreement presumably contemplated--but, rather, punishment for the dismissed counts themselves.**6** And, if that is what a departure does, then, they assert, the parties to a plea agreement that dismisses counts could not have contemplated in their agreement the possibility that the court would depart upward on the basis of dismissed-count conduct.

_____

**6** The specific argument is that the "guidelines provide that conduct not resulting in a conviction may be considered in determining a defendant's sentence if, and only if, that conduct qualifies as`relevant conduct,' as defined in U.S.S.G. § 1B1.3" and that, as is true, § 1B1.3 conduct can never provide a basis for upward departure. Appellants' Brief at 20-21. The logical conclusion from this argument, however, would be to disallow departures altogether as means for "determining a defendant's sentence." The appellants cannot mean to suggest that conclusion, but they are led to language necessarily implying it by their incorrect perception that an upward departure must involve a determination to punish for more than the bargained count of conviction.

15

Proceeding on their assumption that departure involves punishment for something beyond the properly contextualized offense of conviction, they argue that the mandates regarding plea agreements in § 6B1.2(a) and Rule 11(e)(3)--which require that the court sentence only for the agreed, pled offense(s)--must be read to exclude upward departures.

The characterization of departures on which the appellants' argument relies is, however, inaccurate. The departure mechanism allows a sentencing court to take into account facts that are relevant to its determination of the seriousness of the offenses of conviction but that have not been adequately considered by the Commission. This does not allow a court to punish non-offense conduct independently. The Commission rejected pure real-offense sentencing in favor of a system that, while considering almost the entire range of facts that might bear on the seriousness of the offense of conviction, confined itself to punishing for that offense and not for other independently culpable conduct as such. See Kim, 896 F.2d at 682-84. The expansiveness of this intended range is suggested by the well established rule that a court can depart upward on the basis of uncharged conduct and even acquitted-count conduct. But the theory of such departures is that they are equivalents of relevant-conduct enhancements, to be used where the Commission has failed to take into account the particular conduct under consideration, not that they are authorized as independent punishments for crimes never charged or for crimes charged but never proven. See United States v. Juarez-Ortega, 866 F.2d 747, 749 (5th Cir. 1989) (approving an acquitted-count-conduct departure in part because the "sentencing court was not relying on[the acquitted-count conduct] to punish the defendant for the extraneous offense, but to justify the heavier penalties for the offenses for which he was convicted"); United States v. Fonner, 920 F.2d 1330, 1333 (7th Cir. 1990) (holding that to depart on the basis of acquitted-count conduct "is not to `sentence' the defendant for a crime . . . he did not commit, but to employ rational criteria to prescribe the sentence for the crime . . . of which he stands convicted"); United States v. Isom, 886 F.2d 736, 739 (4th Cir. 1989) (relying on and quoting Juarez-Ortega); U.S.S.G. § 5K2.0 (describing departure at some length as a mechanism to be used only where the Commission has failed to consider a relevant circumstance in its formulation of specific offense characteristics or other aspects of the Guidelines).

16

Such a wide-ranging use of sentencing facts--indeed the entire practice of sentencing-phase factfinding--rests on the principle that, regardless of the disposition of other charges or even failure to charge, a crime for which an offender has actually been convicted can and must be punished by, but only by, consideration of the full context of the particular crime's commission. Taking account of that full context must then involve consideration of all conduct surrounding commission of the particular offense at issue--whether that conduct has been taken into account in the Guidelines as a specific offense characteristic or, being relatively rare, not so taken into account but nevertheless relevant and therefore an appropriate ground for departure. It is wrong, therefore, to think, as the appellants' theory requires, of departures based on conduct underlying dismissed counts as reflecting judicial determinations that pled counts do not adequately reflect the seriousness of the offender's actual criminal behavior, see § 6B1.2(a), or that the sentence should reflect something other than the disposition provided for in the plea agreement, see Rule 11(e)(3). We hold, accordingly, that the commands of § 6B1.2(a) and Rule 11(e) regarding the court's acceptance of a plea agreement are no obstacles to a court's departing upward on the basis of proven conduct underlying counts that have been dismissed pursuant to a plea agreement.

3.

If the philosophy of the Guidelines, therefore, does not suggest the reading of § 6B1.2(a) and Rule 11(e)(3) that the appellants seek, and if their plea agreements cannot be read on their own as embodying a restriction on departure that an accepting court would be bound to respect, then the only remaining argument is that§ 6B1.2(a)'s proviso, approving use of dismissed-count conduct as§ 1B1.3 relevant conduct,**7** negatively implies a Commission determination that such conduct not be used for § 1B1.4 departures. That argument loses

_____

**7** The proviso in § 6B1.2(a) reads as follows:

> Provided, that a plea agreement that includes the dismissal of a charge . . . shall not preclude the conduct underlying such charge from being considered under the provisions of § 1B1.3 (Relevant Conduct) in connection with the count(s) of which the defendant is convicted.

17

much of its initial appeal once it is recognized that, as discussed above, there is no fundamental, philosophical difference between the functions of § 1B1.3 and § 1B1.4--between enhancements and departures--that would have warranted the Commission's making the claimed distinction in this context. This is a bad case, therefore, for application of the maxim, on which the appellants rely, that a specific positive command directly implies complementary negative commands. That maxim is rarely given much independent force by courts or respect by scholars because, as here, it is usually more plausible to suppose that the drafter of the positive command simply did not consider problems apart from that one immediately at hand. See Herman & MacLean v. Huddleston, 459 U.S. 375, 387 n.23 (1983) (observing that such canons of construction as "expressio unius est exclusio alterius" have long been "subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose") (internal quotation marks and citation omitted); Cass R. Sunstein, Law and Administration after Chevron, 90 Colum. L. Rev. 2071, 2109 n.182 (1990) (arguing that the expressio unius maxim "is a questionable one in light of the dubious reliability of inferring specific intent from silence"); Reed Dickerson, The Interpretation and Application of Statutes 234 (1975) (arguing that expressio unius does "nothing more than describ[e] results reached by other means").

Had the Commission given any thought to the possibility of so subtle a negative implication here, it surely would have added a short phrase to § 6B1.2(a)'s proviso making plain whether it intended either to include or exclude § 1B1.4 departures from the proviso's scope. But the Commission did not speak, most probably because it simply did not stop to consider that its reassurance to the courts that they could use dismissed-count conduct as "Relevant Conduct" in the technical, § 1B1.3 sense might be taken as disapproval of its use for departures under § 1B1.4.

As the appellants point out, there doubtless are good practical reasons, if not reasons that emerge from the basic philosophy of the Guidelines, why the Commission could have wanted to permit enhancements but not departures on the basis of dismissed-count conduct. It could have determined that defendants and their lawyers, in the real world of plea-bargaining, could be expected to take the

18

Guidelines manual in hand and figure out reasonably accurately what enhancements the defendant would face under the terms of any particular plea agreement but that such defendants and lawyers should not be expected to estimate whether a departure was likely or even possible, let alone how large the departure might be. Further, the Commission could have determined that allowing dismissed-count conduct to be used for departure would inject too much instability into the plea bargaining process, thereby infecting it with unfairness and creating a disincentive for defendants to engage in a process vital to criminal justice systems. However, we are given no evidence that the Commission actually had these thoughts. It did not, in fact, expressly disallow such departures. Nor did it intimate any concern for the supposed impropriety of allowing them in any policy statement or commentary.

Moreover, the argument that the Commission could not have wished by this means to create such a disincentive to plea bargaining by defendants completely disregards the fact that large numbers of defendants apparently found sufficient incentive to plead in return for dismissal of counts even in the pre-Guidelines days of complete judicial discretion in sentencing. The incentives then and now have included the likelihood (although with no guarantees) of lenient treatment from the court, the benefit of having fewer convictions on one's record, the limitation of ultimate sentence exposure to the statutory maximum of the count(s) of conviction rather than to the cumulative statutory maximums of all the counts, and more. See United States v. Fine, 975 F.2d 596, 603 (9th Cir. 1992).

In short, there is no policy reason for the appellants' position so compelling as to force on us the conclusion that the Commission must have meant to adopt that position by negative implication when it positively authorized the use of dismissed-count conduct as § 1B1.3 relevant conduct. Rather, we find it far more plausible that that authorization, which only confirmed what the general theory of the Guidelines and the specific provisions of § 1B1.3 would have led courts to do anyway, simply reflected the broad policy that acceptance of a plea agreement that dismisses counts does not require any special judicial forbearance in sentencing-phase factfinding regarding the conduct underlying those counts.

19

4.

Consequently, we now join the Second and Tenth Circuits in holding that a dismissal of counts pursuant to a plea agreement does not bar a court's reliance on conduct underlying those dismissed counts to sustain its decision to depart upward from the otherwise applicable guideline range. In this case, therefore, the district court was not barred by the plea agreement's provision for dismissal of the robbery and felony-murder counts from considering whether the conduct underlying those counts--the robbery--actually occurred and actually was relevant to determining the relative seriousness of the specific second-degree murder to which Barber and Hodge pled.

III.

Barber's final ground for appeal is independent of any theory of departure as such. He contends that the district court was not free in this case even to make the finding that he robbed his victim. He argues that the only reliable evidence that the robbery took place was his own post-plea admission and that Guideline § 1B1.8 protects him --although not Hodge--from having that statement used against him at sentencing. The problem with this argument is that the district court did not actually rely on Barber's protected statement in making its finding but relied, instead, on Hodge's wholly unprotected statement.

Everyone agrees that Barber's statement does indeed qualify for protection under § 1B1.8, and so the district court explicitly disavowed any reliance on it in making its finding that the robbery occurred and that it would depart upward on that basis. Instead, the court declared that its finding rested on Hodge's unprotected statement, given shortly after his arrest. That statement offered a detailed account of the crime including the robbery, which the district court deemed sufficiently credible to support a finding that the robbery had occurred. Although Barber accurately points out that the government itself repeatedly expressed real doubts about the trustworthiness of Hodge's statement, the district court was, of course, not bound by any such expressions and was free to evaluate the evidence for itself. We cannot, therefore, find clear error in the court's conclusion that at least the relevant parts of Hodge's statement were accurate and that Barber did in fact commit the robbery. See 18 U.S.C. 3742(e) ("The

20

court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous . . . .").

IV.

Finding two of the district court's three grounds for departure invalid, we vacate the sentences of both Barber and Hodge and remand for resentencing. See Williams, 503 U.S. at 200-03. On remand, the district court should not consider premeditation or discharge of a firearm as grounds for departure.

SO ORDERED

21